UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JERRY WAYNE RILEY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-00158 |
| | § | |
| ALEXANDER/RYAN MARINE | § | |
| SERVICES CO., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

A central issue in this case is whether the oil and gas spar platform in the Gulf of Mexico where Plaintiff Jerry Riley worked is a vessel.  Riley alleges that while working on the platform he suffered spinal injuries when a survival craft he was testing released prematurely.  Riley filed suit in this Court, bringing claims under the Jones Act and general maritime law against, among others, two British Petroleum entities: his employer, BP America Production Company, and the platform owner, BP Exploration and Production Inc. (collectively the "BP Defendants").  Both BP Defendants moved for summary judgment on the ground that Riley is not a seaman because he was not working on a vessel.  The Court has considered the facts of the case, the arguments of counsel, and the appropriate authorities, and now determines that the BP Defendants' Motions for Summary Judgment (Docket Entry Nos. 14 and 30) should be **GRANTED**.

I.    BACKGROUND[1]

Riley was employed by BP America Production Company on the Mad Dog, an oil and gas spar platform located in the Gulf of Mexico on the Outer Continental Shelf and owned by BP Exploration and Production Inc.  On March 27, 2012, Riley was injured while testing one of the Mad Dog's lifeboats.  Riley alleges that the premature release of the survival craft release mechanism caused injury to his spine when the lifeboat hit the water.

Riley brought suit under the Jones Act and general maritime law.  Named as defendants are the BP entities and Alexander/Ryan Marine Services Co., which Riley contends negligently inspected the survival craft the day before his injury.  The BP Defendants separately moved for summary judgment, each contending that Riley's claims under the Jones Act are barred because the Mad Dog is not a vessel.  With respect to the claims asserted under general maritime law, they make different arguments based on their different roles.  The employer, BP America Production Company, argues that the maritime law claims fail because the Longshore and Harborworkers Compensation Act (LHWCA) provides Riley's exclusive remedy for injuries suffered on the Outer Continental Shelf.  The platform owner, BP Exploration and Production Inc., argues that (a) Riley's unseaworthiness claim is barred because there can be no such claim without a

---

[1] The Court recites the facts of this case resolving all factual disputes in favor of nonmovant Riley.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

vessel and (b) Riley's negligence claim is barred because it lacks the required connection to a traditional maritime activity.

Several characteristics of the Mad Dog are relevant to this inquiry. The Mad Dog spar was assembled onsite in 2005 to access eight wells and has no steering mechanism, system of self-propulsion, or raked bow. The spar was intended to be used at its current location for approximately 25 years. Eleven polyester rope and chain mooring lines connect the spar to eleven suction piles driven into the seabed 4,500 feet below. The Mad Dog is also connected to two pipelines on the floor of the Outer Continental Shelf that are designed to transport natural gas and oil. Although tethered to the floor of the Outer Continental Shelf, the Mad Dog is capable of movement in a 180-to-221-foot radius with its crew and equipment on board. The range of movement between wells for drilling operations is approximately 180 feet, while the range of movement due to environmental conditions—like wind, wave, or current—is approximately 221 feet. The Mad Dog has not moved wells in over four years.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue on any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant has the burden of establishing that there are no genuine issues of material fact.  *Celotex Corp. v. Catrett*, 877 U.S. 317, 331 (1986).  All reasonable doubts on questions of fact must be resolved in the non-movant's favor.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.   DISCUSSION

### A.   Jones Act Claims

The foundational question in any Jones Act case is whether the plaintiff qualifies as a Jones Act seaman.  Under *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), a plaintiff must show the following in order to bring a Jones Act claim: (1) that his duties "contribut[e] to the function of the vessel or to the accomplishment of its mission" and (2) "a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and nature."  *Id.* at 368 (citation and internal quotation marks omitted). Before this test, however, the more "fundamental prerequisite" that must be addressed is whether any of the structures or vehicles worked on by the plaintiff count as "vessels."  *Manuel v. P.A.W. Drilling & Well Serv., Inc.*, 135 F.3d 344, 347 (5th Cir. 1998) (citing *Burchett v. Cargill, Inc., 48* F.3d at 173, 176 (5th Cir. 1995)).

A vessel is defined for the purposes of the Jones Act as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3; *see also Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 490 (2005) (stating that section 3 defines vessel for the purpose of the Jones Act).  The relevant inquiry in determining vessel status is "whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one."  *Stewart*, 543 U.S. at 496 (citation omitted).  "Under [section] 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  *Id.* at 497.  However, "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement."  *Id.* at 493.[2]

---

[2] The BP Defendants argue that the three-factor test from *Fields v. Pool Offshore, Inc.*, 182 F.3d 353 (5th Cir. 1999), also remains applicable to determine vessel status of work platforms.  *See id.* at 358 ("First, we ask whether the structure was constructed to serve primarily as a work platform. Second, we look to whether or not the structure was moored or otherwise secured at the time of the accident.  Lastly, we attempt to ascertain whether the transportation function of the structure went beyond theoretical mobility and occasional incidental movement." (citation omitted)).  However, *Stewart*'s language rejecting a focus on primary purpose and snapshot determinations of movement suggests the three-factor test is no longer controlling.  *See Stewart*, 543 U.S. at 495 ("Section 3 requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel.  It does not require that a watercraft be used *primarily* for that purpose. . . .  Also, a watercraft need not be in motion to qualify as a vessel under [section] 3." (citation omitted)); *see also Abram v. Nabors Offshore Corp.*, No. H-09-4091, 2010 WL 3433056, at *3 (S.D. Tex. Aug. 5, 2010) ("The Supreme Court subsequently disavowed the work platform test . . . .").  But the Court need not decide this issue because the BP Defendants prevail without applying *Fields*.

Riley urges the Court to find that the Mad Dog is a vessel, relying heavily on *Stewart*. In *Stewart*, the Supreme Court held that the Super Scoop dredge used in Boston's Big Dig was a vessel. *Id.* at 497. Although the Super Scoop had "only limited means of self-propulsion" and "moved long distances by tugboat," the dredge moved short distances across Boston Harbor by manipulating its anchors and cables every couple of hours. *Id.* at 484–85. Accordingly, the Court determined that the Super Scoop was a vessel because it was used to transport equipment and workers over water as it "traverse[d] the Boston Harbor." *Id.* at 495. In other words, the dredge was both practically capable of and actually used for maritime transportation. *See id.* at 495.

Riley emphasizes that, like the Super Scoop, the Mad Dog is capable of moving short distances with its workers and equipment on board by adjusting its mooring lines. But the "Court must evaluate whether the watercraft in issue is 'practically capable of maritime *transportation*,' not whether it is practically capable of *movement*." *Rushing v. Pride Int'l, Inc.*, No. H-11-0294, 2011 WL 3021043, at *6 (S.D. Tex. July 22, 2011) (emphasis added) (citing *Stewart*, 543 U.S. at 496) (rejecting argument that offshore oil production facility was a vessel because it was capable of movement within a 350-foot radius). The Mad Dog is not practically capable of maritime transportation, as opposed to mere movement. Unlike the Super Scoop, it is attached to eleven suction pilings on the sea floor,

located 4,500 feet below, and to two production pipelines.  As a result of this infrastructure, the Mad Dog's range of movement is restricted.  Additionally, the undisputed evidence indicates that the process of disconnecting and dismantling the existing infrastructure in order to move the spar to a new location would take at least sixteen months.  Specifically, moving the Mad Dog to another location would require abandoning and plugging the eight wells; removing each well's jumpers; removing the eleven mooring lines; decommissioning the production drill site's infield lines; and removing hydrocarbons from the jumpers, infield oil and gas risers, and sales lines.  Moreover, the process would employ heavy lift vessels and other specialized equipment that requires up to two years of lead time.  Thus, while the Super Scoop in *Stewart* was able to frequently and easily transport itself incrementally across Boston Harbor, the Mad Dog's complex infrastructure renders it practically incapable of transportation.

The Fifth Circuit's recent decision in *Mendez v. Anadarko Petroleum Corp.*, 466 F. App'x 316 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 979 (2013), is instructive.  In *Mendez*, the Fifth Circuit applied *Stewart* to a floating gas-production platform, the RED HAWK spar.  *Id.* at 318–19.  The RED HAWK was moored to the sea floor by six permanently taut mooring lines attached to eighteen-foot suction anchors that prevented the spar's lateral movement and by export pipelines linking the spar with other production facilities.  *Id.* at 317.  Moving the

spar would have taken approximately 50 days and cost over $42 million.  *Id*.  The Fifth Circuit affirmed the district court's grant of summary judgment and held that the RED HAWK was not a vessel given that the spar was "permanently affixed to the sea floor and [could] only be moved after detaching the substantial moorings and pipelines that [had] been joined to its structure."  *Id.* at 319.  Specifically, the Court noted that "the relocation study show[ed] at most that the RED HAWK [was] theoretically capable of maritime transportation but not practically capable." *Id*.

The Mad Dog spar is materially similar to the RED HAWK spar.  Riley argues that *Mendez* is inapposite because the RED HAWK spar was capable of no lateral movement while the Mad Dog is capable of lateral movement from well to well and due to environmental conditions.   Again, this argument misses the difference between movement and transportation.   Although the Mad Dog is unquestionably capable of more movement than the RED HAWK, the Mad Dog remains incapable of transportation.  Like the RED HAWK, the Mad Dog is for all practical purposes permanently connected to the sea floor.  In fact, the Mad Dog's connections to the sea floor make an even stronger case for non-vessel status; while the RED HAWK was held in place by six mooring lines and would take an estimated 50 days or more to disconnect, the Mad Dog is held in place by eleven mooring lines and would take an estimated sixteen months or more to disconnect.

Riley also urges the Court to ignore *Mendez* because it is an unpublished case. But *Mendez* is not an outlier. In other post-*Stewart* decisions, district courts have found comparatively limited ranges of movement insufficient to confer vessel status.[3] *See, e.g.*, *Warrior Energy Servs. Corp. v. ATP TITAN*, No. 12-2297, 2013 WL 1739378, at *3–5 (E.D. La. Apr. 22, 2013) (holding floating production facility attached by twelve pilings on the sea floor with 200-foot range of movement was not a vessel); *Mooney v. W & T Offshore, Inc.*, No. 12-969, 2013 WL 828308, at *5 (E.D. La. Mar. 6, 2013) (holding offshore platform with six tendons attached to seabed was not a vessel); *Moore v. Bis Salamis, Inc.*, 748 F. Supp. 2d 598, 608 (E.D. Tex. 2010) (holding offshore platform attached to sixteen pilings on the sea floor with 350-foot range of movement was not a vessel); *Jordan v. Shell Oil Co.*, No. G-06-265, 2007 WL 2220986, at *2 (S.D. Tex. Aug. 2, 2007) (holding tension leg connected to sixteen pilings on the sea floor was not a vessel). Riley cites no post-*Stewart* cases that support his position.[4]

---

[3] *Mendez* and most of these decisions predated the Supreme Court's decision in *Lozman v. City of Riviera Beach*, 133 S. Ct. 735 (2013). However, *Lozman*—if anything—tightened the requirements for vessel status. In *Lozman*, the Supreme Court rejected the broad, "anything that floats" definition of a vessel, stating "the mere capacity to float or move across navigable waters does not necessarily make a structure a vessel." *Id.* at 740, 743 (citation and internal quotation marks omitted). Instead, the Court explained—assuming a structure is not permanently moored—a structure is not practically capable of maritime transportation "unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.* at 740–41.

[4] Riley does contend that the Coast Guard's classification of the Mad Dog as a vessel demonstrates the spar's status as a legal vessel. However, Riley has not provided any evidence about the Coast Guard's classification process or the legal effect of the Coast Guard's registration system under maritime law.

Based on the record and the relevant authorities, the Court finds that the Mad Dog is a permanent structure attached to the seabed and, thus, not practically capable of maritime transportation. Because the Mad Dog cannot be afforded the legal status of a vessel, Riley is not a Jones Act seaman, and his claims under the Jones Act fail.

### B. General Maritime Claims

#### 1. The Platform Owner

BP Exploration and Production Inc. contends that the finding that the platform is not a vessel also bars Riley's unseaworthiness and negligence claims asserted under general maritime law, an argument to which Riley does not respond.[5] "Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) (citation omitted). A vessel's unseaworthiness can be caused by a variety of circumstances, including a vessel's defective gear, unfit crew, or improper loading. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). Because a claim for unseaworthiness implicitly requires the existence of a vessel and the Court held above that the Mad Dog spar is not vessel, Riley's claim for unseaworthiness fails.

---

[5] BP America Production Company also moved for summary judgment on Riley's claims for maintenance and cure. Because the claims for maintenance and cure are excluded from Riley's Amended Complaint (Docket Entry No. 17), this part of the motion is **DENIED** as moot.

A claim for negligence under general maritime law requires the plaintiff to show that (1) the tort occurred on navigable water or that the injury on land was caused by a vessel on navigable water and (2) the incident had a "potentially disruptive effect on maritime commerce" and that the activity giving rise to the incident has a "substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citation omitted).  Riley cannot satisfy the second element.  The Fifth Circuit has explicitly stated that "[c]onstruction work on fixed offshore platforms bears no significant relation to traditional maritime activity."  *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352 (5th Cir. 1999) (holding that plaintiff's tort claim for injury on fixed offshore platform lacked connection to traditional maritime activity).  Accordingly, because Riley's alleged injury occurred on a fixed offshore platform, his claim for negligence under general maritime law against BP Exploration and Production Inc. is barred.

## 2. *The Employer*

These rulings would also warrant dismissal of Riley's general maritime claims asserted against his employer.  But BP America Production Company raises the additional point that the LHWCA is Riley's exclusive remedy against an employer for injuries occurring on a fixed platform on the Outer Continental Shelf. The Outer Continental Shelf Lands Act makes compensation for employees injured

"as the result of operations conducted on the [O]uter Continental Shelf for the purpose of exploring for, developing, removing, or transporting . . . the natural resources" of the Outer Continental Shelf payable under the LHWCA, which provides a no-fault workers' compensation system. 43 U.S.C. § 1333(b). The LHWCA provides that the LHWCA "shall be exclusive and in place of all other liability of such employer to the employee." 33 U.S.C. § 905(a). Accordingly, a "maritime worker is limited to LHWCA remedies [] if no genuine issue of fact exists as to whether the worker was a seaman under the Jones Act." *Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81, 89 (1991). Because of the Court's ruling that the Mad Dog is not a vessel, the LHWCA is Riley's exclusive remedy against BP America Production Company. [6]

---

[6] In contrast, the LHWCA would not bar an OCSLA claim asserted against a nonemployer like BP Exploration and Production, Inc.

12 / 13

## IV.   CONCLUSION

For the reasons detailed above, the undisputed facts demonstrate that the Mad Dog spar is not a vessel and the incident lacks the required connection to a traditional maritime activity.  Riley is therefore not entitled to recover against the BP Defendants under the Jones Act and general maritime law, and the Motions for Summary Judgment (Docket Entry Nos. 14 and 30) are **GRANTED**.

**SIGNED** this 24th day of October, 2013.

_____
Gregg Costa
United States District Judge